**BROWN v. WISCONSIN SYNDICATE et al.**

Circuit Court of Appeals, Eighth Circuit. April 15, 1927.

No. 7486.

1. **Corporations** ⟨⟩152—Directors held not guilty of fraud or breach of trust, as against life tenant, in not declaring dividends of all net earnings, allowing equity interference.

Under the facts, directors of a corporation whose uniform policy had been to invest its net returns in additional real estate and pass it to capital assets on the books, though they were remaindermen in bequest of stock therein, *held* not guilty of fraudulent conduct or breach of trust, as against rights of life tenant of shares in not declaring dividends of all net earnings necessary to authorize interference of equity.

2. **Wills** ⟨⟩684(2)—Intention to give life tenant proportionate share of surplus over corporation's original capital investment held not shown by life bequest of net income.

Testator, by giving in trust his estate, including shares of stock, to pay "net income" thereof for life, having known and participated in the policy of corporation to invest its net returns in additional real estate, and pass it to capital assets on its books, *held* not to show intention to give life tenant her proportionate share of the surplus over and above the original capital investment.

Appeal from the District Court of the United States for the District of Minnesota.

Suit by Alfred Lockwood Brown, trustee under will of Robert Leslie Moffet, deceased, against the Wisconsin Syndicate and others. Bill dismissed, and plaintiff appeals. Affirmed.

Oscar Hallam, of St. Paul, Minn. (W. R. Cray and Elijah Barton, both of Minneapolis, Minn., on the brief), for appellant.

J. B. Faegre, of Minneapolis, Minn (M. H. Boutelle and J. O. P. Wheelwright, both of Minneapolis, Minn., on the brief), for appellees.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

LEWIS, Circuit Judge. This is a stockholder's suit. The stockholder, plaintiff below and appellant here, holds 10 shares of stock in Wisconsin Syndicate, a corporation, bequeathed to him in trust by the will of Robert Leslie Moffet. The trust imposed by the will as to these shares and other property left by decedent is, that the trustee (Alfred Lockwood Brown) was "to keep invested and to pay the net income thereof to my said wife during her natural life. On the death of my said wife I direct my said trustee to distribute the said rest, residue and remainder of my estate among my brothers surviving my said wife, share and share alike; in case any of my brothers should not survive my wife, leaving lawful issue, then the share of such deceased brother shall be distributed equally between the issue of such deceased brother."

The capital stock of the corporation consisted of 50 shares, each of the par value of $100, and was all owned by the decedent and his four brothers, each having 10 shares. It was engaged in buying, owning, improving, renting and selling real estate. At the time of the death of testator on February 23, 1918, it owned between 30 and 40 different tracts or lots in the city of Minneapolis and apparently most of them were improved, from which the Syndicate received rentals. Many of the tracts were mortgaged to a total amount of $140,000, and the Syndicate was otherwise indebted in connection with its business to the extent of about $55,000.

This suit was instituted in 1923, against the Syndicate and the surviving brothers, who were the remaining directors of the Syndicate. The decedent was a director until the time of his death. The plaintiff claimed in his suit that the life tenant, the widow of Robert Leslie Moffet, had not received the income from the corporation to which she was entitled. He asked that a receiver be appointed, that the defendants be restrained from making payments out of the income from the real property upon mortgages on its properties, on contracts and purchases of real estate that had been made, and that sufficient of the real estate of the Syndicate be sold to pay plaintiff the income to which it might be found that he was entitled as trustee for the benefit of the life tenant.

After answer the court, on motion of the plaintiff, appointed a master to take and report the proof to be offered by the parties, specifically a detailed accounting of the affairs of the Syndicate showing the state of its business on February 23, 1918, with the value of its assets of that date as shown by the books and records of the corporation, and its liabilities of that date, also a like accounting up to the hearing of the proof showing receipts and earnings, disbursements, amounts used for permanent improvements and betterments, and amounts charged as depreciation of the property. The books of the Syndicate were balanced as of February 23, 1918, showing total assets of that date of $534,000 plus, all but $20,000 of which consisted of the book value of real estate owned by the Syndicate. Its liabilities were $203,000 on that date, exclusive of capital stock. This was returned by the master. By agreement of the parties the master also returned a statement of account as of date August 31, 1924, taken from the books of the company, showing the assets and liabilities as of that date, also the receipts and expenditures of the corporation from February 23, 1918, down to August 31, 1924. The total amount in even figures of assets and their value, as shown by the books, of the later date was $761,000 plus, consisting of $661,000 in real estate, $16,000 plus in cash and $42,000 plus in Liberty, municipal, corporate and railway bonds, $850 in office equipment, $3,500 prepaid insurance, $10,000 in fuel on hand, $500 in accrued interest receivable, and the remainder in accounts and contracts receivable. Liabilities in August, 1924, were shown by the books to be $276,000 plus. This included capital stock, leaving an excess of assets in the sum of $485,000 plus. The master also returned a statement of the book accounts, showing receipts and disbursements from February 23, 1918, to August 31, 1924. Total receipts amounted to $762,000 plus; total disbursements $631,000, in which was included $80,775 declared and paid out during that time as dividends. During that time the corporation set up a depreciation reserve account and charged against its surplus during 1919 to 1924, both inclusive, $177,095.51 Its receipts during the time from February, 1918, to August 31, 1924, consisted of $736,000 plus in rents, interest received $7,200, net

earnings from sales $14,000, commissions and sundry small receipts. Its disbursements during the same time were, for fuel, janitor's services and items of like character $185,000 plus, taxes $94,000, interest payments $124,000 plus, general expenses $70,000, repairs $62,000, improvements $15,405. The master reported that the depreciation charges for each of the six years "seem to have been made in accordance with prevailing practice," that the books did not disclose an appraisal of the property, except as entered upon the books, and that to accurately determine depreciation an appraisal was necessary. The record shows that testimony was taken before the master, but none of it appears in the record here, and there is nothing to show that an appraisal was made of the property for the purpose of advising the master whether the depreciation charges were excessive.

The chief contention of appellant here is that the $177,000 entered on the books of the company as depreciation against capital assets, and also the $15,400 expended, according to the books, for improvements and betterments, should have been paid out in dividends. It is apparent that the depreciation account was a mere matter of bookkeeping. The corporation did not have on hand at any time, so far as the record shows, that amount in cash or in assets readily convertible into cash. The only item of that kind before us is the data taken from the books, showing cash and bonds of date August 31, 1924, to the aggregate of $59,000 plus. It is further complained that the corporation acted without right in paying its receipts in discharge of its mortgage indebtedness, which, we must assume, is included in some of the above named items of disbursement. But there is no proof in the record as to the circumstances under which those payments were made. They may have been necessary, and doubtless were necessary, to save the assets from which rent was being received, and if not paid those assets would doubtless have been sacrificed under foreclosure. Neither are we advised as to the facts and circumstances under which the $15,405 was paid out, as shown by the books, for betterments. Those payments may have been highly beneficial. The property, if we are to judge from the items of account, was occupied by tenants, and those expenditures may have greatly increased the rental income. We have no information whatever on that subject.

Exceptions were filed to the master's report. They were overruled, and the court made findings of fact. They are in large part a repetition of what appears in the book accounts reported by the master. It was found "that there was no evidence tending to show any impropriety or unfairness in the charges to 'depreciation'" for the five years beginning with 1920, which totaled $77,095.51. The remainder of the depreciation account, $100,000, was entered on August 31, 1919, and it was found that prior to that time no charge had been made by the corporation on account of depreciation. The five brothers began purchasing and improving property in Minneapolis about 1903, as copartners. A few years later the corporation was organized which took over their business, so that it appears that during the first 15 years of their business activities no depreciation charge had been entered. The court further found that the directors of the corporation had at no time been actuated by fraud or unfairness in determining the amount of the earnings and net income of the property and in the declaration of dividends, and that what they had done in that respect was within their discretion, which had been reasonably exercised, and on the testimony and record made in the case and its findings of fact the court dismissed the bill.

An audit of the books showed that from February 23, 1918, to August 31, 1924, 6½ years, the receipts amounted to $762,238.50, and the expenditures to $551,238.50, leaving an excess in earnings of $211,000. During that time $80,775 was paid out in dividends. This, it is said, left in hand $130,225; which should have been distributed to stockholders; and conceding that the $77,000 charged to depreciation during the years 1920 to 1924 should be deducted also, still there was $53,000 that plaintiff claims should have been paid out in dividends. In that connection nothing is said about the $100,000 charged against the surplus account at the end of August, 1919, as depreciation. We do not know counsel's reason for treating this charge differently from the other annual charges of depreciation for other of those years, amounting to $77,095.51.

We think none of the depreciation charges has any bearing on the issue. They were made against the invested capital account, evidently because it was believed that much of the real estate was being carried on the books at an excess in value. The court found that there was no evidence tending to show any impropriety or unfairness in these charges, and there is no claim that the record brought here contains any testimony

tending to show that the court erred in that finding. We dismiss the subject of depreciation charges because it has no bearing on the issue, it did not affect the rights of plaintiff in this case, it had no relation to cash in hand out of which dividends are paid; and because the court found those charges were not improper or unfair.

[1] Coming back to the excess of receipts of $211,000, during the 6½ years out of which dividends of $80,775 were paid, we find no proof as to what was done with the remaining $130,000. Necessarily it was not all on hand at one time. The only showing in that regard is that according to the books the corporation on August 31, 1924, had cash and liquid assets to the aggregate of $59,000 plus. Its business was active in receipts and disbursements. It had given mortgages, it owed other debts, its taxes were large in amount and its current expense account was heavy. It had been gradually increasing its capital investments for many years, with the co-operation of the testator, and there is no suggestion that he expected or desired a change in that policy. The accounts and the history of the corporation shown thereby demonstrate that excess receipts were applied in part to increase capital assets. This trustee says that policy should stop, dividends should be paid out of excess receipts and out of a sale of capital assets if that becomes necessary; and to that end he asks that the directors be compelled to act by court decree. A mere statement of the proposition causes doubt both as to the propriety and power of such judicial interference with corporate management. A stockholder obtains and continues to hold his rights as such subject to the rules of law governing corporate management, and as long as those who are elected directors for that purpose by the stockholders are not guilty of fraudulent conduct or acts in violation of their trust to his damage he has no cause of complaint nor is he entitled to invoke judicial relief for claimed grievances because of their action or nonaction.

As to whether dividends shall or shall not be declared is left to the board of directors. Cook on Corporations (8th Ed.) § 545, states the general rule thus: "When, therefore, the directors have exercised this discretion and refused to declare a dividend, there will be no interference by the courts with their decision, unless they are guilty of a willful abuse of their discretionary powers, or of bad faith or of a neglect of duty. It requires a very strong case to induce a court of equity to order the directors to declare a dividend, inasmuch as equity has no jurisdiction, unless fraud or a breach of trust is involved." Fletcher, Cyclopedia Corporations, § 3656, deduces the same rule from the adjudications. The reasons for the rule are obvious. In addition to the lack of power, except on the condition named, it would be intolerable that corporate business should be constantly under the threat of extraneous interference on the complaint of every stockholder because of his dissatisfaction with the policy of the management. The rule on the subject is not different from the statement of it by Cook, supra, when the issue is between a life tenant and remainderman to the shares. That question was presented to the Supreme Court in Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. Ed. 525.

At page 562 of that opinion (10 S. Ct. 1060) the court quoted with approval the following from English decisions:.

"As long as the company have the profits of the half-year in their hands, it is for them to say what they will do with it, subject, of course, to the rules and regulations of the company." "The dividend to which a tenant for life is entitled is the dividend which the company chooses to declare. And when the company meet and say that they will not declare a dividend, but will carry over some portion of the half-year's earnings to the capital account, and turn it into capital, it is competent for them, I apprehend, to do so; and when this is done, everybody is bound by it, and the tenant for life of those shares cannot complain."

And on pages 558 and 559 (10 S. Ct. 1058), the court, speaking through Mr. Justice Gray, said:

"Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, it follows that the interest therein, represented by each share, is capital, and not income, of that share, as between the tenant for life and the remainderman, legal or equitable, thereof.

"Whether the gains and profits of a corporation should be so invested and apportioned as to increase the value of each share of stock, for the benefit of all persons interested in it, either for a term of life or of years, or by way of remainder in fee; or should be distributed and paid out as income, to the tenant for life or for years, excluding the remainderman from any participation therein; is a question to be determined by the action of the corporation itself, at such times

and in such manner as the fair and honest administration of its whole property and business may require or permit, and by a rule applicable to all holders of like shares of its stock; and cannot, without producing great embarrassment and inconvenience, be left open to be tried and determined by the courts, as often as it may be litigated between persons claiming successive interests under a trust created by the will of a single shareholder, and by a distinct and separate investigation, through a master in chancery or otherwise, of the affairs and accounts of the corporation, as of the dates when the provisions of the will of that shareholder take effect, and with regard to his shares only.

"In ascertaining the rights of such persons, the intention of the testator, so far as manifested by him, must of course control; but when he has given no special direction upon the question as to what shall be considered principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnings, and to have intended that the determination of that question should depend upon the regular action of the corporation with regard to all its shares."

[2] Here there was no injunction or request made of the surviving brothers by the decedent. He gave no definition of "net income" from this or from any other part of his estate. He knew the policy of the corporation was to invest its net returns in additional real estate and pass it to capital assets on its books. He had participated in that policy up to the time of his death. No dividends had theretofore been paid. The $80,775 was all declared and paid to stockholders as dividends on dates after his death. He could have given the life tenant her proportionate share of the surplus over and above the original capital investment, had he so intended. No such intention is disclosed in his will. See Lanston v. Lanston, 53 App. D. C. 340, 290 F. 315.

On the findings of fact made by the court (and there is no evidence in the record requiring contrary conclusions), the terms of the bequest and the uniform policy of the corporation from the time of its organization, we think there is no ground for the claim that the directors in refusing or failing to declare additional dividends were guilty of fraudulent conduct or a breach of trust as against the rights of the life tenant, hence no case was made of equity jurisdiction, and the court did not err in dismissing the bill.

Affirmed.